IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,              )
                                       )
                     Plaintiff,        )
                                       )
        v.                             )          Case No. 09-20057-01-JWL-DJW
                                       )
HERMAN RANSOM,                         )
                     Defendant.        )
                                       )
_____ )


**MEMORANDUM AND ORDER**


On May 20, 2009, an Indictment was filed charging defendant Herman Ransom

with ten counts of wire fraud in violation of 18 U.S.C. § 1341 and ten counts of theft of

government property in violation of 18 U.S.C. § 641.  On March 29, 2010, a jury

convicted Mr. Ransom on all counts.  The matter is currently before the Court on Mr.

Ransom's Motion for Judgment of Acquittal or, in the Alternative, for New Trial or

Arrest of Judgment (doc. #53).  As explained more fully herein, the Court denies Mr.

Ransom's Motion.

I.  Factual and Procedural Background

Mr. Ransom worked for the United States Department of Housing and Urban

Development ("HUD"), with the duty to oversee its Office of Multifamily Housing

("OMH") programs in Kansas, Missouri, Iowa, Nebraska, and Oklahoma.  As a

supervisor and manager of approximately 89 employees, Mr. Ransom was classified as a General Schedule (GS)-15 level supervisory employee.[1]  He worked in the regional office of HUD in Kansas City, Kansas.  Every other week, Mr. Ransom submitted a Time and Attendance Record (T & A record), as well as a Summary Sheet or a STAR Time and Attendance Report.  These records and reports set forth the number of hours Mr. Ransom claimed to have worked within the relevant time period, as well as the number of hours taken off work.  The T & A record included the following categories, among others: regular time, annual leave, sick leave and family leave.[2]  Mr. Ransom's secretary prepared the reports and Mr. Ransom signed them.  They were then approved by Mr. Ransom's supervisor and forwarded to the payroll administrative office.

On May 20, 2009, an Indictment was filed, alleging that Mr. Ransom inaccurately recorded the number of hours that he spent working on HUD related business during particular pay periods, thus resulting in Mr. Ransom being paid in excess of that amount he would otherwise have been entitled to.  According to the government, Mr. Ransom occasionally played tennis and gambled at casinos between the hours of 8 am and 4:30 pm, hours considered to have fallen within Mr. Ransom's workweek and which he claimed to have been working during for purposes of time and attendance.   As Mr. Ransom did not use a form of approved leave to account for his absences, the government

---

[1] Kathleen Stull, a human resources specialist at the regional office in Kansas City, Kansas, explained at trial that there are 15 grades under the General Schedule and that there are ten pay levels within each grade.

[2] An employee could also be on leave without pay, an approved form of leave.  If the employee were absent without using authorized leave, he would be considered absent without leave.

alleged that he devised a scheme to defraud the United States under the wire fraud statute, 18 U.S.C. § 1343, and that he stole from the United States something of value under 18 U.S.C. § 641.

Mr. Ransom moved to dismiss the Indictment on July 27, 2009, asserting that his status as a salaried supervisory employee, exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act (FLSA), precluded any conviction either for wire fraud under § 1341 or theft of government property under § 641. On August 25th, the Court held a motion hearing, at which time the Court granted Mr. Ransom's unopposed motion to declare the matter as complex and ordered the parties to provide supplemental briefing concerning Mr. Ransom's Motion to Dismiss the Indictment. On November 9th, the Court entered an order denying Mr. Ransom's Motion. On January 19th, 2010, Mr. Ransom filed a Motion for Reconsideration, which the Court subsequently denied. The matter thus proceeded to trial and Mr. Ransom was convicted by a jury on all counts on March 29th, 2010.

## II. Standards

Mr. Ransom moves for judgment of acquittal, or, in the alternative, for a new trial or arrest of judgment. As regards his motion for judgment of acquittal, the Court must uphold the jury's verdict of guilty if "'any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *United States v. Urbano*, 563 F.3d 1150, 1156 (10th Cir.2009), *cert. denied*, 130 S.Ct. 434, 175 L.Ed.2d 297

(2009) (quoting *United States v. Doddles*, 539 F.3d 1291, 1293 (10th Cir.2008)).  The

court must "'ask only whether taking the evidence-both direct and circumstantial,

together with the reasonable inferences to be drawn therefrom-in the light most favorable

to the government, a reasonable jury could find the defendant guilty beyond a reasonable

doubt.'"  *United States v. Erickson*, 561 F.3d 1150, 1158 (10th Cir.2009), *cert. denied*,

130 S.Ct. 173, 175 L.Ed.2d 109 (2009) (quoting *United States v. Hanzlicek*, 187 F.3d

1228, 1239 (10th Cir.1999)).  "'While the evidence supporting the conviction must be

substantial and do more than raise a mere suspicion of guilt, it need not conclusively

exclude every other reasonable hypothesis and it need not negate all possibilities except

guilt.'"  *Erickson*, 561 F.3d at 1158-59 (quoting *United States v. Burkley*, 513 F.3d 1183,

1188 (10th Cir. 2008), *cert. denied*, 128 S.Ct. 2979, 171 L.Ed.2d 902 (2008)).

 As for Mr. Ransom's alternative motion for a new trial, Federal Rule of Criminal

Procedure 33 provides that "the court may vacate any judgment and grant a new trial if

the interest of justice so requires."  Fed.R.Crim.P. 33.  "A motion for a new trial is not

regarded with favor and is only issued with great caution."  *United States v. Herrera*, 481

F.3d 1266, 1269-70 (10th Cir.2007) (citing *United States v. Trujillo*, 136 F.3d 1388, 1394

(10th Cir.1998)).  The decision whether to grant a motion for new trial is committed to

the sound discretion of the trial court. *United States v. Stevens*, 978 F.2d 565, 570 (10th

Cir.1992).

III.  Analysis

Mr. Ransom presents four primary arguments in support of his Motion for Judgment of Acquittal or, in the Alternative, for New Trial or Arrest of Judgment.  The Court addresses each in turn.

A.  Ransom's Status as a Salaried, Exempt Federal Employee

First, Mr. Ransom asserts that as a salaried federal employee, exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act (FLSA), he was not required to work a fixed number of hours or account for time absent from work with a form of approved leave to be entitled to his full salary.  He argues that he was entitled to his salary regardless of whether his time and attendance records contained correct information and that he therefore could not be deemed to have stolen government property under § 641 nor devised a scheme to do so under § 1341.  Mr. Ransom also asserts that his convictions are based upon violations of various civil regulations and policies and procedures and that this constitutes a denial of due process of law.  For these same reasons, Mr. Ransom asserts that the evidence presented at trial was insufficient to convict him of either offense.

The Court addressed Mr. Ransom's legal arguments at length in response to Mr. Ransom's Motion to Dismiss the Indictment for Failure to State an Offense (doc. #16). *See generally United States v. Ransom*, 2009 WL 3756977 (D. Kan. Nov. 9, 2009) (slip copy).  *See also United States v. Ransom*, 2010 WL 420056 (D. Kan. Jan. 28, 2010) (slip

copy) (denying Mr. Ransom's Motion for Reconsideration).  There, the Court first explained that a federal employee may properly be convicted for wire fraud under 18 U.S.C. § 1341 based upon submission of falsified time and attendance records, regardless of whether the submission of the falsified reports impacted the amount the employee received in any given pay period, because the employing agency is deprived of valuable information concerning the employee's work habits, thus permitting the employee to remain employed and to continue to receive a salary despite the reduced work hours. *Ransom*, 2009 WL 3756977, at *3-4.  The Court likewise concluded that such action could subject a federal employee to criminal liability for theft under § 641 because an FLSA-exempt, salaried employee is not entitled to his salary unless he works the requisite administrative workweek or accounts for absent time with a form of approved leave.  *Id.* at *7.  If the employee does not account for absent time with leave, the employee is not entitled to his full salary.  As the unpaid salary of the employee remains the "property" of the government, the employee may be found to have stolen from the United States a "thing of value" and thus be criminally liable for theft under § 641.  *Id.* at *4.  Additionally, the Court rejected Mr. Ransom's argument that the government's reliance upon various statutes, regulations, and memoranda to support its assertion of criminal liability rendered unconstitutionally vague the criminal statutes under which Mr. Ransom was charged.  *Id.* at *7-10.  Lastly, the Court rejected Mr. Ransom's argument that the government had impermissibly attempted to establish criminal liability based upon violations of civil regulations and administrative policies or procedures.  For these reasons, more thoroughly explained in the Court's prior order, the Court denies Mr.

Ransom's Motion for Judgment of Acquittal or, in the Alternative, for New Trial or Arrest of Judgment upon this basis.

B.  Sufficiency of the Evidence Concerning Intent

Second, Mr. Ransom asserts that the government presented insufficient evidence of intent to support his convictions under either 18 U.S.C. § 1341 or 18 U.S.C. § 641. The Court addresses each in turn.

1.  Wire Fraud

To obtain a conviction for wire fraud under 18 U.S.C. § 1341, the government must prove (1) Mr. Ransom engaged in a scheme to defraud; (2) he did so with the intent to defraud; and (3) use of interstate wire or radio communications to execute the scheme. *See United States v. Lewis*, 594 F.3d 1270, 1274 (10th Cir. 2010).  *See also United States v. Wittig*, 575 F.3d 1085, 1093 (10th Cir. 2009).  Mr. Ransom challenges the sufficiency of the evidence regarding two of these elements: the scheme to defraud and Mr. Ransom's intent.  The Tenth Circuit has explained that "a scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension."  *See United States v. Hanson*, 583 (10th Cir. 1994).  Moreover, fraudulent intent may be derived from the defendant's "indifference to the truth of statements" and "even though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations."  *United States v. Reddeck*, 22 F.3d 1504, 1507 (10th Cir. 1994) (quoting *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.

1980)).  With these standards in mind, the Court addresses each of Mr. Ransom's contentions.

a.  Scheme to Defraud

Mr. Ransom asserts that the government did not present sufficient evidence for a jury to reasonably conclude that Mr. Ransom submitted his T & A reports for the purpose of advancing the alleged scheme to defraud, because the government did not establish that Mr. Ransom believed submission of T & A reports was a prerequisite to the receipt of his salary.  The Court views this argument as simply another means of asserting that Mr. Ransom lacked the necessary criminal intent to commit the crime, a matter discussed in greater detail below.  However, the jury could readily conclude from the evidence presented that there existed a scheme to defraud the government by submission of falsified T & A records.  First, as previously explained, this Court had concluded as a matter of law that Mr. Ransom was required to either work the time required by his administrative workweek (eighty hours per biweekly pay period) or account for absences with approved leave.  The government additionally presented the testimony of several government witnesses who explained that Mr. Ransom was required to take a form of approved leave if he engaged in personal activities during working hours.  Second, the government presented a significant amount of evidence that Mr. Ransom did not work on HUD related business at times that his T & A reports listed him as having worked during, and that Mr. Ransom had nonetheless signed the T & A reports, certifying that they contained accurate information.  Special Agent Karen Gleich of the HUD Office of

Inspector General (HUD-OIG) testified that Mr. Ransom's "core hours" were considered to be 8 am to 4:30 pm, based upon the business hours of the Kansas City office and the fact that Mr. Ransom would list these times on his T & A records when he took approved leave.[3]  Special Agent Gleich testified that she participated in surveillance of Mr. Ransom,[4] and witnessed him playing tennis on some Mondays, Wednesdays and Fridays, leaving the Racquet Club at around 9 am, going to his residence for approximately 30 to 45 minutes afterwards, and finally arriving at his office at approximately 10 or 10:30 am. Bill Sparks of the Overland Park Racquet Club corroborated this testimony, explaining that Mr. Ransom played tennis with the "early birds" group, which played from 7:30-9:00 am on Mondays, Wednesdays and Fridays.  Special Agent Gleich also testified that she witnessed Mr. Ransom leaving work to go to gamble at the casinos[5] and the government introduced records from the casinos[6] as well as surveillance photos and video to establish that Mr. Ransom was indeed at the casinos rather than at the office during times he claimed to have been working.  *See* Government's Exhibits 154-175.  Utilizing the information received, the government presented exhibits summarizing for the jury the percentage of days that Mr. Ransom allegedly engaged in personal activities during

---

[3] One of Mr. Ransom's timekeepers, Ms. Adree Burton, also testified that Mr. Ransom listed 8 am to 4:30 pm as his working hours if he took leave.

[4] Special Agent Gleich testified that the HUD Office of Inspector General conducted surveillance on thirty two days.

[5] Special Agent Gleich explained that Mr. Ransom occasionally left the office at noon to gamble, and that he would go back to work later in the afternoon.  On other occasions, he left in the middle of the afternoon or towards the end of the working day.

[6] Records from the following casinos were introduced: Ameristar, Argosy, Harrah's, and Isle of Capri.  *See* Government Exhibits 166-175.

business hours without taking approved leave,[7] and the amount of subsequent loss to the government.  Employees in the Kansas City office also testified to Mr. Ransom's absenteeism.  Ms. Brenda Waters, the Operations Officer in Kansas City considered immediately below Mr. Ransom in position, and who reported directly to Mr. Ransom, testified that Mr. Ransom would go into the office anywhere from 7 am to 10:30 am during the time that she worked with him, and that she could not determine any particular pattern as to the days he would be late.  In addition, two of Mr. Ransom's assistants who kept his time, Ms. Karen Stokes-Tyiska and Ms. Adree Burton,[8] testified to his absences.  Ms. Burton, for example, testified that Mr. Ransom came into the office anywhere from 9 to 10 am, and that he occasionally left early, at around 2 or 3 pm.  She explained that he took leave for this time on certain occasions, while at other times he did not.  Ms. Stokes-Tyiska explained the process for submitting T & A records and testified that at the end of the biweekly pay period, Mr. Ransom was required to sign a Time and Attendance Record and the Summary Sheet or STAR Time and Attendance Report, both certifying as correct, that all "regular time, leave, overtime, night differential and holiday time was worked and approved to law and regulations."  Thus, the government presented sufficient

---

[7] The summaries indicated that 47% of the time, Mr. Ransom did not engage in such personal activities without using leave, that 11% of the time, he would work for part of the day and would also play tennis *and* gamble, that 19% of the time he would leave work to gamble without taking authorized leave, and that 23% of the time he would play tennis in the mornings without taking leave.  *See* Government Exhibit 187.

[8] Ms. Adree Burton testified that she had no suspicions about whether Mr. Ransom was actually working on HUD related business while out of the office, and that she believes Mr. Ransom always provided her with accurate time and attendance information.  The government attempted to impeach her testimony as conflicting with prior statements she had made.

evidence for a jury to reasonably conclude that there existed a scheme to defraud the government by submission of falsified T & A records.

b. Intent

Mr. Ransom also argues that the government failed to present sufficient evidence that he acted with the specific intent to defraud or to obtain money or property by means of false pretense or representation. Mr. Ransom points out in particular that all of the witnesses questioned testified that they did not speak with Mr. Ransom about the necessity of working during certain hours, or of the memorandum issued in 2001 regarding alternative work schedules. The government thus presented no direct evidence that Mr. Ransom was trained or otherwise notified that he had to work certain hours or account for absences during those hours with approved leave. Mr. Ransom also points to evidence at trial establishing that he received numerous service awards[9] and successful or outstanding performance evaluations during the time period in which he was alleged to have engaged in this misconduct. According to Mr. Ransom, this demonstrates that he did not understand his conduct to be criminal, but rather that he believed that he was performing his job in an "outstanding" manner.[10] However, the Court finds unpersuasive

_____

[9] The evidence at trial established that Mr. Ransom received fourteen such awards during the relevant time period.

[10] However, the government repeatedly emphasized during trial that nothing could have been done about time and attendance reporting misconduct if Mr. Ransom's superiors did not know about it. Ms. Janet Golrick, the Associate Deputy Assistant Secretary for the Office of Multifamily Housing Programs, testified that she would not have given an

11

these arguments and concludes that the government presented ample evidence from which the jury could infer Mr. Ransom acted with the requisite intent.

All of the government's witnesses who were questioned about their understanding of the time and attendance requirements testified that they were required to work eighty hours per pay period or account for time absent from work with a form of approved leave. This included testimony from the following individuals, among others: Ms. Kathleen Stull, a human resources specialist in the Kansas City office; Macie Houston, the former regional director for HUD region seven, the region in which Mr. Ransom worked, and to whom Mr. Ransom would submit leave requests; and Janet Golrick, the Associate Assistant Secretary for the Office of Multifamily Housing Programs, who has the responsibility to oversee the day-to-day national operations for the Office of Multifamily Housing from her office in Washington, D.C and who described herself as Mr. Ransom's boss. There was similar testimony from Mr. Edward Hinsberger and Mr. Robert Reavis, who—like Mr. Ransom—were directors of Multifamily Housing for their respective regions. Moreover, all testified that there was no difference in this respect between a high level supervisor, such as Mr. Ransom, and a lower level non-supervisor, such as a secretary. All were required to work eighty hours or account for absent time with approved leave. Indeed, Randy Speed, an employee at the National Finance Center, which processes HUD T & A reports, explained that the system will even reject a time

_____

employee outstanding or even satisfactory reviews, for example, if she knew they were absent from work during business hours without using a form of approved leave. She also stated that she would not have given Mr. Ransom performance awards had she known of his absenteeism.

and attendance sheet that does not account for the full eighty hours per biweekly pay period. Moreover, certain witnesses, including Ms. Stull and Mr. Hinsberger, testified to the importance of a supervisor understanding the time and attendance requirements. Ms. Stull explained that supervisors were expected to be familiar with the policies. Mr. Hinsberger, director of the Multifamily Program for Illinois and Indiana, noted that a supervisor would need to understand the requirements in order to properly discipline subordinates. He also testified that he personally had been trained on how to submit time and attendance reports. For example, he explained that a Human Resources employee would occasionally be at director meetings to explain changes in leave policies.

In his defense, Mr. Ransom elicited testimony from witnesses concerning work he had done outside of ordinary office hours, in an attempt to demonstrate that he had compensated for the time he spent engaging in personal activities during working hours. He also asserted that he remained available via cell phone while engaging in such personal activities. Indeed, many testified that they knew Mr. Ransom occasionally participated in community meetings in the evenings or visited HUD properties at night, and that they were always able to reach him on his cell phone. However, the jury could reasonably have believed that Mr. Ransom's work outside of office hours did not compare to the hours he spent gambling or playing tennis, and that his mere cell phone availability did not constitute "work." Moreover, several government witnesses testified to the effect that the hours Mr. Ransom may have worked outside of his "core hours" of 8 am to 4:30 pm were not to be considered a substitute for the necessary eighty regular

hours per biweekly period.  For example, Mr. Hinsberger testified that he did not count hours worked outside of his core hours towards the biweekly requirement and that he would not leave early simply because he arrived at work early.  He testified that it was more important for a supervisor to work until the job was finished than to put in an eight hour day, but he explained that if he completed the job at 10 am, he would not feel free to leave the office, but rather would start on another job.  Similarly, Robert Reavis, director of the Multifamily Programs in the regional office in Atlanta, Georgia, testified that supervisors and non-supervisors are all required to work eighty hours on a biweekly basis and that all have to account for absent time with a form of approved leave.[11]  Ms. Brenda Waters testified that she understood she was required to account for time absent during core working hours with approved leave, and that she believed Mr. Ransom was likewise required to do so.  Former regional director Macie Houston explained that she would not consider it appropriate for Mr. Ransom to have been gambling at the casinos during working hours without taking leave, that she would not consider Mr. Ransom to have been doing his supervisory duties if he were merely able to take a call on his cell phone while gambling or playing tennis, and that the fact he visited properties after hours, for example, would not absolve him of the requirement to work the regular eighty hours or take leave for absences.  She explained that Mr. Ransom could not receive overtime or

---

[11] Mr. Reavis did testify that there might be a bit of flexibility, in that a supervisor who had a meeting late in the evening might come into work a bit later the next day. However, he clearly expressed that supervisors were nonetheless required to account for the full eighty hours, and explained that the 2001 memorandum expressed the desire of the Deputy Secretary for all supervisors to be at work five days a week, eight hours a day. Thus, the jury could reasonably have concluded from the evidence presented that Mr. Ransom understood the eighty hour biweekly requirement and did not satisfy it.

comp time for such additional activities, for example. Ms. Golrick testified that there might be some degree of flexibility, such that a supervisor who had a late night tenant meeting might come in a bit later the next morning, but she explained that this could not be done on a routine basis, and that those hours could not be considered a substitute for the requirement that a supervisor work during business hours and put in eighty hours every two weeks. From the testimony of these individuals, the jury could have inferred that Mr. Ransom would likewise have understood the T & A reporting requirements to prohibit an individual in his position from engaging in personal activities during regular working hours without taking a form of approved leave.

As previously noted, Ms. Stokes-Tyiska also testified that Mr. Ransom signed the T & A records and Summary Sheets or STAR Time and Attendance Reports at the end of every two weeks, certifying as correct the information reported on the forms regarding time worked and leave taken. Thus, the jury could infer intent to defraud from the fact that the reports contained inaccurate information and from the government's evidence that Mr. Ransom nonetheless signed the reports, certifying that they were correct. In addition, the government presented evidence that Mr. Ransom at times requested leave in order to engage in personal business during regular working hours. For example, Ms. Stokes-Tyiska and Ms. Adree Burton identified forms submitted by Mr. Ransom requesting annual and sick leave at various times. *See, e.g.,* Government's Exhibit 6. Ms. Adree Burton also testified that Mr. Ransom occasionally took leave for his absences while he failed to do so on other occasions. From this evidence, the jury could

reasonably conclude that Mr. Ransom understood the necessity of requesting leave if he intended to be absent during working hours.

In addition, Ms. Stokes-Tyiska testified about an unpleasant incident she had with Mr. Ransom concerning his time and attendance reporting, from which a jury could infer that Mr. Ransom acted with specific intent to defraud. Ms. Stokes-Tyiska served as Mr. Ransom's program assistant and timekeeper. Typically, Mr. Ransom would simply provide her with the necessary information concerning the number of hours he worked and the leave he took during a particular pay period. After the forms were completed, Mr. Ransom would sign to certify their accuracy. However, on one occasion, Ms. Stokes-Tyiska left a leave slip upon Mr. Ransom's desk when she believed he had been out playing tennis during business hours. She testified that Mr. Ransom angrily questioned her about why she left the leave slip on his desk, and that he informed her he did not need her counsel and would decide for himself when he needed to fill out a leave slip. Ms. Stokes-Tyiska testified that she was transferred shortly thereafter, and that Mr. Ransom replaced her with Ms. Burton. Ms. Burton testified that she had known Mr. Ransom prior to her employment at HUD because she was friends with Mr. Ransom's daughter. She also testified that she would not have questioned Mr. Ransom's truthfulness if he informed her that he had been working during hours that he had actually been out of the office. From this testimony, the jury could reasonably have concluded that Mr. Ransom decided to replace the assertive Ms. Stokes-Tyiska with a personal acquaintance less likely to question his conduct, and the jury could therefore have

inferred that he understood he was not properly accounting for absences with leave despite the importance of doing so, and that he thus intended to defraud the government in submitting inaccurate time records.

Ms. Stull also testified that Mr. Ransom formally reprimanded lower level employees for absences without authorized leave. For example, Mr. Ransom issued a formal written notice April 2, 2002 to an employee who had allegedly claimed and received overtime pay for hours not worked. In this notice, Mr. Ransom stated:

> Departmental guidelines identify factors that I must consider in determining the penalty. I have reviewed the factors discussed in the Proposal Notice and agree with the Proposing Official. In summarizing these factors, known as the Douglas Factors, I find your offenses were serious, repeated multiple times, intentional and for personal gain. The systems that you took advantage of have been in use for years and the procedures are well known. As indicated in the Proposal, it was obvious you knew the rules because you clearly used them to your advantage. As a Funding Control Specialist, you are trusted with maintaining control of millions of project dollars, yet you used two administrative systems for funds for your personal use. This has impacted negatively on management's ability to trust you with financial responsibilities. As indicated in the Proposal, there are other employees who are aware of your offenses and would expect management to take disciplinary action and insure that the money is repaid. This suspension is necessary to convey to you and to others that you cannot take travel or salary money not due to you under any circumstances. It is not your money for personal use; taxpayers have entrusted the money to the Government for office use.

Government Exhibit 210, p. 2.

From the fact that Mr. Ransom reprimanded lower level employees for the same conduct in which he engaged, and the language of this notice, the jury could reasonably have concluded that Mr. Ransom himself understood and appreciated the importance of requesting leave if absent for personal reasons, regardless of his supervisory status.

Finally, the government introduced into evidence a document Mr. Ransom drafted after being notified by Special Agent Michael Powell of the complaint concerning his time and attendance reporting from which the jury could infer Mr. Ransom had the requisite intent to defraud.[12]  In the document, Mr. Ransom stated:

> Being the senior multiple family housing manager in this region I am on the clock 24/7.  I am responsible for a five state area with an inventory of more than 2000 properties.  I am in the field a lot visiting my offices, staff, and also visiting properties throughout the jurisdiction.  I am constantly reading new HUD notices at home during evenings on the weekends often hours at a time.  This does not include the hours I spend visiting properties locally in Kansas and Missouri…I visit properties after midnight to get the real feel for what our tenants are dealing with drug and crime.  I have visited properties with staff at their request at midnight because residents were complaining that this is the time the real problems occur.  I do this because I take pride in my work and want to ensure that folks are living in safe housing.  I work many hours that I am not compensated for.  I don't complain because I know this is part of my job…

> *See* Government's Exhibit 214.

Mr. Ransom did not express the opinion that he believed his conduct was permissible under HUD policies and regulations in this document.  Indeed, he recognized that he was not "compensated" for time spent working on HUD related business outside of ordinary office hours.  Thus, from it, the jury could have concluded that Mr. Ransom intentionally submitted the inaccurate T & A reports.

## 2.  Theft of Government Property

To obtain a conviction under 18 U.S.C. § 641 for theft of government property, the government had to prove beyond a reasonable doubt that (1) Mr. Ransom embezzled,

---

[12] Special Agent Powell testified that he notified Mr. Ransom of the complaint on May 4, 2007.  The document was taken from Mr. Ransom's computer.

stole, purloined or converted; (2) a record, voucher, money, or a thing of value; (3) belonging to the United States; and (4) Mr. Ransom acted with the requisite intent. 18 U.S.C. § 641. It did not matter whether Mr. Ransom knew that the money he received belonged to the United States government, only that he knew it did not belong to him. *See United States v. Speir*, 564 F.2d 934, 938 (10th Cir. 1977). Moreover, as previously explained, the Court had ruled that Mr. Ransom could be found criminally liable for theft of government property under §641 for submitting falsified T & A records because the unpaid salary of a government employee such as Mr. Ransom remained the property of the United States. Thus, the remaining issues at trial for the jury were whether Mr. Ransom actually submitted falsified T & A records and whether he did so with intent. Mr. Ransom challenges the sufficiency of the government's evidence concerning his intent: he argues that the government failed to present sufficient evidence that he knew the property did not belong to him. At trial, Mr. Ransom attempted to defend himself on the grounds that he did not understand he had to submit T & A records with accurate information, as he believed a salaried, FLSA-exempt federal employee in his position was entitled to his full salary regardless of the number of hours that he listed as having worked on his T & A records. For all the reasons set forth in the Court's discussion of the sufficiency of the government's evidence concerning Mr. Ransom's intent to commit wire fraud, the Court concludes that the government presented sufficient evidence of Mr. Ransom's intent to steal from the United States something of value, namely the unearned portion of his salary.

C.  Instruction 15

Third, Mr. Ransom contends that the Court erred in submitting to the jury

Instruction 15, on the grounds that the instruction misstated the law.  Instruction 15

provided as follows:

> Federal employees such as the defendant must either work the hours called for by
> their administrative workweeks or account for absent time with approved leave.
> However, the defendant's intent as defined in these instructions is for you to
> decide.

As explained above, the Court has previously concluded that a salaried federal

employee of Mr. Ransom's status must either work the requisite administrative

workweek or account for absent time with a form of approved leave.  *See United States v.*

*Ransom*, 2009 WL 3756977, at *6 (D. Kan. Nov. 9, 2009) (slip copy).  Thus, the Court

concludes that Mr. Ransom is not entitled to a judgment of acquittal or new trial upon

this basis.

D.  Alleged Errors Concerning the Theft Conviction

Fourth, Mr. Ransom asserts that this Court erred in instructing the jury with regard

to the charge for theft of government property under § 641, and that the evidence

presented at trial modified the charge as set forth in the Indictment, resulting in a variance

or constructive amendment of the Indictment.  The Court addresses each contention

below.

1. Variance or Constructive Amendment of the Indictment

The Indictment charged Mr. Ransom under § 641 with willfully and knowingly stealing *and* converting to his own use money belonging to the United States. At trial, however, the government moved forward only on the theft theory and consequently presented no evidence of a conversion. Thus, Mr. Ransom asserts that the evidence at trial modified the charge set forth in the Indictment, resulting in a variance or constructive amendment. According to Mr. Ransom, the Supreme Court's holding in *Stirone v. United States*, 361 U.S. 212, 217 (1960), requires that the government prove the theories as alleged in the Indictment, and Mr. Ransom consequently argues that the government thus could not simply elect which theory to present to the jury.

However, the Tenth Circuit explained in *United States v. Hill*, 835 F.2d 759 (10th Cir. 1987) that the Indictment may charge the defendant in the conjunctive. *Hill*, 835 F.2d at 764 (citing *Turner v. United States*, 396 U.S. 398, 390 (1970)). As the Tenth Circuit has noted, it is "'hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive.'" *United States v. Powell*, 226 F.3d 1181, 1192 n. 4 (10th Cir. 2000) (quoting *United States v. Gunter*, 546 F.2d 861, 868-89 (10th Cir. 1976). *See also United States v. Pauldino*, 443 F.2d 1108, 1112 (10th Cir. 1971) ("[W]e do not believe that the government's proof of some but perhaps not all of the prohibited modes of violating the statute constitutes a fatal defect in appellant's conviction. It is settled that where a crime denounced disjunctively in the statute is charged in the conjunctive, proof of any one of

the allegation will sustain a conviction.").  Mr. Ransom contends that to the extent the

Tenth Circuit in *Hill* permitted the government to elect which theory to proceed under,

the holding is inconsistent with *Stirone*.  However, the indictment in *Stirone* did not

charge in the conjunctive; rather, the government attempted to prove an offense for which

he had not been charged in the indictment whatsoever, and the Supreme Court found

error where the trial court had instructed the jury it could find the defendant criminally

liable under either the theory charged in the indictment or the theory the government

presented at trial.  *Stirone*, 361 U.S. at 215.  It is not inconsistent with *Stirone* to permit

the government to charge in the conjunctive and prove in the disjunctive, as the defendant

is not then convicted of an offense for which he was never charged in the indictment.  As

the Indictment charged Mr. Ransom with committing the offense by theft and conversion,

the government presented evidence at trial only of theft, and the Court instructed only on

the theory of theft, the Court concludes that a variance or constructive amendment of the

Indictment did not occur.  Mr. Ransom was not charged with an offense for which he had

not been indicted, *see Stirone*, 361 U.S. at 215, and the Court instructed only on the

theory that the government presented evidence of at trial.

2.  Failure to Instruct on Willfulness

Mr. Ransom also asserts that the Court erred in failing to instruct the jury,

pursuant to the defendant's proffered Instruction #22,[13] that the jury had to find Mr.

---

[13] The defendant offered to the Court Instruction #22, which stated in relevant part:

Ransom acted "willfully" in order to convict him under 18 U.S.C. § 641. Mr. Ransom points out that Instruction 14 given by the Court required the jury to find the defendant acted "knowingly." As the Indictment charged the defendant with knowingly and willfully violating 18 U.S.C. § 641, and the Court allegedly failed to instruct as to willfulness, Mr. Ransom argues that there was a variance or constructive amendment of the Indictment.

Instruction 14 stated as follows:

> The defendant is charged in Counts Eleven through Twenty of the Indictment with a violation of 18 U.S.C. § 641. This law makes it a crime to steal, embezzle or convert government property. The defendant is accused of stealing or converting to his own use money he received as salary for hours he did not work, in the amounts as set forth in the Indictment. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> FIRST: the money he received belonged to the United States government. It does not matter whether the defendant knew the money he received belonged to the United States government, only that he knew it did not belong to him; and
>
> SECOND: the defendant stole the money he received as salary for hours he did not work intending to put it to his own use or gain or the defendant took the money knowing it was not his and intending to deprive the owner of the use or benefit of the money.

---

In order to prove the defendant guilty of knowingly stealing and converting money or property belonging to the United States government, the government must prove each of the following elements beyond a reasonable doubt:

…

Third, that the defendant acted knowingly and willfully with the intent to deprive the government of the use and benefit of its property;

Although Instruction 14 did not reference the willfulness necessary to find Mr.

Ransom guilty under § 641, the Court gave a separate instruction on the requisite intent

which did.  Instruction 16 stated as follows:

> With respect to Counts Eleven through Twenty, *the government must prove beyond a reasonable doubt that the defendant acted knowingly and willfully*, with the intent to deprive the government of the use and benefit of its property.  To act knowingly means to act voluntarily and purposely, and not because of mistake or inadvertence or other innocent reason. *To act willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say, with the* bad purpose to disobey or disregard the law. Whether the defendant acted knowingly and willfully may be proven by the defendant's conduct and by all of the circumstances surrounding the case (emphasis added).

When evaluating a challenge to a jury instruction, the Court need not find that the

instructions as a whole are flawless, but rather "must be satisfied that, upon hearing the

instructions, the jury understood the issues to be resolved and its duty to resolve them."

*Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1237 (10th Cir. 2002).  The

Court considers the instructions given as a whole to determine whether they "adequately

state the law and provide the jury with an ample understanding of the issues and

controlling principles of law."  *United States v. Edwards*, 69 F.3d 419, 433 (10th Cir.

1995) (citing *Brown v. Wal-Mart Stores, Inc.*, 11 F.3d 1559, 1564 (10th Cir. 1993)).  *See

also United States v. Allen*, 603 F.3d 1202, 1213 (10th Cir. 2010) (explaining that the

Tenth Circuit reviews the instructions as a whole de novo to determine whether the

applicable law was correctly stated) and *Craven v. Univ. of Colorado Hosp. Authority*,

260 F.3d 1218, 1236 (10th Cir. 2001) (noting that the instructions are to be considered in

their entirety).  When read in their entirety, the instructions clearly did provide the jury

with an ample understanding of the requisite intent to convict Mr. Ransom under 18 U.S.C. § 641. Instruction 16 not only required the jury to find the defendant acted willfully, but also provided a more precise definition of willfulness, which Mr. Ransom's proposed Instruction #22 lacked. As the jury was instructed that they had to find the defendant acted knowingly and willfully to convict for theft, the Court finds meritless Mr. Ransom's arguments concerning Instruction 14.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Ransom's Motion for Judgment of Acquittal, or, in the Alternative, for New Trial or Arrest of Judgment (doc. #53) is **denied**.

**IT IS SO ORDERED.**

Dated this 23rd day of June, 2010, in Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge